And our next case for argument this morning is Stingley v. Laci Transport. Good morning, Your Honors. If it pleases the Court, Mr. Hickey, my name is John Billhorn and I represent a class of about 240 truck drivers whose duties were performed at the Chicago Assembly Plant on Torrance Avenue here in Chicago. We ask that you reverse the District Court's Granting of Defendant's Summary Judgment in this Fair Labor Standards Act Failure to Pay Overtime case because the District Court did not apply the correct criterion to the shipping model, the supply chain model that is used at the Ford Assembly Plant and instead relied upon the shipping model and the supply chain model in the Collins v. Heritage Wine case that Judge Posner wrote in 2009. So is your argument that the District Court should not have applied the Collins factors at all or that the Court misapplied the Collins factors? We have no quarrel with the Collins factors given the shipping model that was at stake in that case. That case had to do with through warehousing. I just want to make sure I understand your argument that are you saying Collins doesn't apply here at all or the Court misapplied Collins here? There's portions of the Collins analysis that Judge Posner's report was anything like the through warehousing that was being applied in the Collins case, but it is not. These drivers, let's back up a minute and just touch on what these drivers do at the Chicago Assembly Plant and Ford's shipping model. Ford manufactures component auto parts in other parts of the country. They assemble them down here off of Torrance Avenue at the Chicago Assembly Plant, affectionately referred to as the CAP. They ship them there to themselves, not to a warehouse for through distribution and allocation to other downstream customers, which is what Collins is all about. And there's factors in Collins that define when the last leg is intrastate, within one state, or when it's the final leg of an otherwise interstate journey. Isn't the focus of the test on the movement of the goods as opposed to who stands to be the ultimate customer? It does, Your Honor. And what Collins developed and Judge Posner talked about was that those, what those factors address, the fixed and persisting intent at the time of shipment, the practical continuity of movement, and when do the products arrive at the final destination, are all factors in the context of the essential character of the shipment. And that's where these supply chain, these shipping models diverge, because this is, Ford is not doing through warehousing. They're shipping items to themselves. They arrive at the CAP. The assembly line usually isn't ready for them because their inventory has to stay out a couple weeks ahead. They got to be sure to have those component parts on the shelf, just like the grocery store does with its cereal. And when the aisle eight is out of cereal, the clerk goes back to the storage room and gets more cereal and brings it out. That's exactly what goes on at the CAP. These goods arrive at the CAP, they're checked in, they're security inspected, they're entered into the, into Ford's computerized inventory system. Mr. Washington and Mr. Love testified that that is determined, the terminology they use at the CAP is, yes, it has arrived. They're on our storage lot. As soon as we're ready to flip from the escorts to the F-150, we send my clients, the shuttle drivers, to the storage room to bring out more cereal, i.e. the auto parts. So, may I please stop you just for a moment, Mr. Wilhorn? Because I think, well, I think an important question is this. You know, you've argued all along that the storage lots should be considered part of the attended destination, considering the lots in the plant as the Ford Assembly Plant campus. Would you make that same argument regardless of whether the lots were five miles or a hundred miles away from the actual Ford Plant itself? In other words, you know, given that the lots are not contiguous to the Torrance Avenue Plant as part of a single parcel of land, on what basis can you characterize all of this as a single campus? I mean, that is my question and I don't want you to go away without answering it. I won't. I'll stay here until I do. Your Honor, that would be a harder argument if these storage lots were a hundred miles away instead of a few blocks away from the CAT. The basis of this, of us describing these storage lots as the back room to the grocery store, is because that's the way Ford testified. Mr. Washington and Mr. Love, the Ford employees, said that that's all part of our campus and they're close enough that we can bring these auto parts to the CAT, arrive them, inspect them, inventory them, and then send them to the storage room because it's only a few blocks away. I don't think Ford would have characterized their storage lots like that if, in your Honor's example, the storage lots were a hundred miles away. We might have more of a warehousing model then, but Professor Hewitt, playing his expert, a supply chain expert, material handling expert, specifically distinguished between the type of shipping that they did in the Collins case, where there's downstream consumers, and a bunch of other factors come into play, like are you judging it on past sales history? When you put it in the warehouse, is there a label on it that's already determined for a particular consumer, or do you not take it out of the warehouse till the phone rings and you know where you're going with it? None of those factors come into play because what Ford does is not through warehousing. They ship it to itself. Do you think that the shuttle trips returning, the empty semi-trailers to the storage lots, should be treated the same as the trips bringing those trailers to the plant, or does the legal analysis differ? I think the legal analysis is the same, your Honor. I think that it is a mirrored argument with regard to the return trip of the empty trailers. When the shuttle drivers pick up an empty trailer and take it back to one of the storage lots to pick up another trailer with auto parts in it, that is strictly within Illinois, strictly within a few blocks of the cap, and strictly confined to the interstate nature of it, not beginning again until the interstate carrier picks up that empty trailer from the storage lot. So it's a mirrored analysis as to the arrival, that being the departure of the trailers, is a mirrored argument that the incoming interstate nature of the trip ends when they arrive at the cap, they're taken to storage lots, and what this plaintiff class does for regular rate pay and working 60 or 65 hours a week have a purely intrastate trip from the storage lots to take the stuff back to the cap again when the assembly line is ready. I see that I'm inside my two minutes, I don't want to run out of time, I know you can get fired for that, and I'll reserve the final amounts for my rebuttal. Thank you. Good morning, I am Timothy Hickey on behalf of all of the appellees, and the first thing I'd like to address is the expert testimony that the council mentioned, and none of that testimony, none of that analysis is based on the Motor Carrier Act, or it's based on, I'm sorry, I'm sorry, the Motor Carrier Act, the statute itself, and the council has not cited a single case which discusses any of that analysis, any of those terms, the shipping model, the supply chain model. The district court didn't address the expert testimony at all. Correct, Judge, the district court applied the Collins analysis correctly, and Collins itself says if these conditions are satisfied, the exemption applies, and the trial court was correctly done at that point. It said that the expert testimony at that point was moot. There was also a pending motion to strike that testimony just because it was irrelevant and not based on the statute or any case law. So Judge Robner was correct that the focus of Collins and the exemption is the movement of goods on public roads as part of an that's the last intrastate leg of an interstate journey, and on the reverse trip of those empty racks, that's the first leg of the interstate journey. In this case, Ford is the shipper. Ford ships the parts mostly from out-of-state Ford plants. So Ford may build an engine in Ohio, and they know that based on customer demand, they're going to need it at the cap to install and move vehicles there. So they order a truckload of engines from the Ohio plant, and Ford is the shipper. Ford hires the interstate trucking carrier, schedules the interstate carrier, all the way to the cap, through the security checkpoint, and then on to the storage lot. So in this case, Ford is in control of the goods the entire trip going both ways, whether it's the parts coming in from out-of-state, all the way through to the storage lots, and then to the cap, and then on the reverse side, the empty racks. Ford is the shipper there as well. They contract with the interstate trucking carrier to carry those empty racks from the storage lot back to the out-of-state parts manufacturer. In my scenario, a Ford plant in Ohio making engines. So those racks are in a continuous loop, and there is no doubt, because they're in that continuous loop of bringing more and more truckloads of parts to the cap, there is no doubt as to their intended final destination for each trip, the racks are meant to be returned all the way back to the out-of-state factory. It does no good for Ford to say, oh gee, we want to only return those racks to the storage lot two miles away. They are in a constant loop, and Ford's intent is clearly for those racks to go all the way back to the lot. Because Ford is in control and directs both the parts in the rack on their entire journey, the issue of when someone might call it arrived, or when it's checked in at the cap, or when it's checked in a storage lot, all of those things are irrelevant because Ford is in charge of these goods for the entire trip. This isn't a situation where title of the goods changes at one point, or they're sold. Ford is in charge of the entire journey. Collins also mentions this with the wine in Collins, that Heritage Wine is in charge of the entire journey from the out-of-state or out-of-the-country location all the way through to the customer. I'd also like to address the idea of the campus. Can I stop you for one second? Do you know if the semi-trailer is received directly to the storage lots without first stopping at the Torrance Avenue plant, and if so, do you know what percentage are directed straight to the lots and why? Judge, there are interstate carriers that bring the parts directly to the storage lots. I can't say for sure an exact percentage, but Ford, by tracking these incoming trucks and knowing what they need right away at the cap, can contact these truck drivers and say, don't go to the cap, go to the storage lot. In fact, my belief is the testimony and the evidence before the trial court showed that there were what were called hot loads, where a semi-trailer full of parts was needed immediately at the cap to be used right away, and those hot loads are the ones that would go directly to the cap, but otherwise the semi-trucks coming from out-of-state would be directed to the storage lot rather than making a needless, many of them would be directed to the storage lot directly. Okay, so like when that would happen, like when a semi-trailer would arrive at the Ford plant, okay, and it would be checked into Ford's inventory tracking system, and then redirected to a storage lot, does the original carrier transport the semi-trailer to the storage lot, or are the shuttle truck drivers used for that initial redirect to the lot? The shuttle drivers are not used for that trip from the cap security station to the lot. It is the same interstate trucking carrier that in my example would have come from and that trailer would not be unhooked at that point, would not be unloaded. They would just receive, go to this storage lot or go to that storage lot, and the same driver would drive that trailer. Okay, thank you, yeah. And as to the amount of the distance, there's certainly no case law that's been cited that says there's a minimum requirement of travel on public roads, and the Motor Carrier Act itself does not contain that, and really any travel on a public road would implicate the safety concerns of the Motor Carrier Act. We cited a case, the Bolar case, where they talk about 1.5 miles between the plant and the storage lot, and the exception applied there, and from this court, the Berlake case dealt with storage lots that were very close, just like in this situation, maybe just a couple miles, and Berlake even mentions one of the storage lots was across the street from the plant. So whether it's one mile or a hundred miles, the Department of Transportation has jurisdiction as soon as those trucks go on public roads. This would be a totally different situation, and the campus term could have some merit if all of these storage lots were contiguous, if this were all one property and none of these trucks drove on public roads. But in our situation, all six of these storage lots are not contiguous, they're within five miles of the plant, but the plaintiffs are driving on public roads, which clearly implicates the safety concerns of the Motor Carrier Act. And getting back to the expert testimony and those terms and those analyses, counsel cites to no case law where that's addressed, where those terms, that analysis is used, and in fact, I did not see one case cited by counsel where the Motor Carrier Act was, the Motor Carrier Act exemption was not granted in a situation even remotely similar to this. I believe the Seventh Circuit's precedent in Collins and Berlake and the other cases we have container cases are all on point with storage lots that may even be closer. And just very briefly, Your Honor, as far as the finished goods idea and the ultimate customer, the empty containers, the empty racks in all of the cases we cited, many of those would go on a continuous loop as well, those were owned by the shipper, they were never sold to any customer, and finally, the case we cited, the Kennedy case we cite at the end of our brief is a case where the exemption applied to Pepsi products being shipped by Pepsi. Pepsi was shipping its own product between its own facilities, and the court in New York found that the exemption did apply even though it was not sold to any downstream customer. Unless the court has any further questions, I would ask the court to affirm the trial court. Thank you. Thank you. Mr. Bilhorn. Your Honor, Your Honors, our briefing lacks reference to this type of shipping model because none of the case law discusses the shipping model that Ford has where it ships these things to itself at the cap and then diverts it to a storage lot until they need it. You review this de novo, so the error was that the district court didn't distinguish between the apples and oranges that we have with Ford and the cap and what we have with Collins and through warehouse. So you can consider Professor Hewitt's testimony and the distinguishment between these two types of shipping models, and no, he's not an expert on the Motor Carrier Act. He's an expert on what kind of shipping model, and then it's for us lawyers to argue whether the Motor Carrier Act exemption should legally apply to one shipping model and should not apply to the other. Ford describes these lots as part of its campus. I don't think jurist or lawyers can take that factual determination. Ford determines that that is all part of their campus and that when it arrives, and this is important, you know, they talk about in all these cases the essential character of the shipment, and what we know is that sometimes these incoming auto parts from Ohio, to use Mr. Hickey's example, do get diverted directly to the storage lots, and to Judge takes that stuff there, but most of the time it is checked into Ford's inventory, there's security checks done at the cap on Torrance Avenue, and even if it does go directly to one of the storage lots, it's still registered into the inventory system that Ford has. These things aren't going anywhere else to anybody else for any other purpose except Ford's use at the cap. The storage lots are part of the campus, Ford considers that part of the campus, and because of that we ask this court to reverse the district court's decision and enter summary judgment on behalf of the plaintiffs so that they can avail themselves to the long-standing overtime, time and a half, that people in this economy rely on every day. Thank you. My thanks to both counsel. The case is taken under advisement.